# SUPPLEMENT

### OPINION OF THE JUSTICES TO THE SENATE.

The legality of the use, for the capture of fur-bearing animals, of a trap or other device which is likely to cause continued suffering to an animal caught therein, and which is not designed to kill such animal at once or to take it alive unhurt, properly may be subjected to local option.

The words, "unless in the meantime it shall have been repealed," in the third sentence of § 3 of "III. Referendum Petitions" of art. 48 of the Amendments to the Constitution, do not apply to all laws as to which a referendum petition has been filed, but are limited in their application to laws as to which the completed referendum petition has been filed at such a time that thirty days do not intervene between the date of the filing and the date of the next State election.

There being pending in the Senate a bill, bearing an emergency preamble, embodying a comprehensive enactment as part of "a plan or compromise" to cover in a new way the entire subject of traps as applied to the capture of fur-bearing animals, and including as a necessary incident the repeal of St. 1933, c. 203, approved May 16, 1933; and it appearing that the operation of said c. 203 had been suspended by reason of a referendum petition completed on August 14, 1933, the Senate on May 23, 1934, submitted to the Justices of this court the question: "5. If the said bill is enacted with an emergency preamble would it be the duty of the Secretary of the Commonwealth to place the question involved in said pending referendum on the ballot to be used at the biennial State election in the current year?" and the Justices answered the question in the negative.

The Justices answered in the affirmative a further question by the Senate, whether, if such proposed bill were enacted without an emergency preamble, the Secretary of the Commonwealth would be under a duty to place the pending referendum as to St. 1933, c. 203, upon the ballot at the State election in the current year.

The answers to the two questions above described, even though they involved the duties of the Secretary of the Commonwealth, were given because the questions appeared to relate essentially to the power of the legislative department of government and the consequences of its proposed action with respect to the form of enactment of the proposed bill: whether the Justices may be required to answer questions concerning the duty of the Secretary of the Commonwealth was stated not to be involved.

On May 22, 1934, the Senate adopted the. following order:

WHEREAS, There is pending before the Senate a bill en-

titled "An Act further regulating the use of traps and other devices for the capture of fur-bearing animals and providing for local option thereon" printed as Senate number three hundred and seventeen, a copy of which is herewith submitted, amending the steel trap law, so called, originally adopted under the initiative provisions of the Constitution at the biennial State election of nineteen hundred and thirty, and amended by chapter two hundred and three of the acts of nineteen hundred and thirty-three, whereof the operation has been suspended by referendum petition duly filed and completed under article forty-eight of the amendments to the Constitution of the Commonwealth, which would in the usual course require the question involved in such petition to be submitted to the voters at the biennial State election in the current year; and

WHEREAS, Section two of said pending bill would repeal the said chapter two hundred and three, suspended by referendum as aforesaid, as a part of a plan or compromise embodied in said pending bill to restore, save for minor changes, the provisions of said initiative law as originally adopted by the people, and to authorize cities and towns to suspend the operation of the provisions of said pending bill within their respective limits; and

WHEREAS, Doubt exists as to the constitutionality of the pending bill if enacted into law and as to the effect of its passage in relation to said pending referendum on said chapter two hundred and three and to a probable referendum on said pending bill itself; therefore be it

ORDERED, That the Senate require the opinions of the Honorable the Justices of the Supreme Judicial Court on the following important questions of law: —

1. May the legality of the use of steel traps as described in section one of said bill be properly subjected to local option?

2. Do the words "unless in the meantime it shall have been repealed", contained in the third sentence of section three of said article forty-eight, under the heading,

"III.   Referendum Petitions.", apply to all statutes as to which a referendum petition has been filed, or is its application limited to statutes enacted less than thirty days prior to the next ensuing State election?

3.  Does the word "repealed" in said third sentence import finality of action by the General Court, or is the repealing act subject to referendum?

4.  Does the fact that such a repeal is embodied in a substitute measure affect the application and scope of the said word "repealed"?

5.  If the said bill is enacted with an emergency preamble would it be the duty of the Secretary of the Commonwealth to place the question involved in said pending referendum on the ballot to be used at the biennial State election in the current year?

6.  If the said bill is enacted without an emergency preamble would the said Secretary be under such a duty?

7.  If the question referred to in question five is required to be placed on said ballot, may the General Court, in anticipation of the filing of a referendum petition as to the said pending bill and a vote thereon at said election, provide, under authority of the paragraph headed "VII. Amendment declared to be Self-executing" or by any other authority, for the grouping of the questions submitted, accompanied by appropriate directions to the voters, in order to avoid confusion in the minds of the voters?

These questions are asked in part in order that the General Court may be advised as to what disposition it should make of the said pending bill by amendment or otherwise, so that (1) the Secretary of the Commonwealth may be definitely apprised as to the course he is required to pursue under the Constitution and statutes in relation to said pending referendum; (2) the submission of confusing and misleading referenda to the voters may be avoided; and (3) the expenditure of large sums of money by the Commonwealth in conducting a possibly futile referendum or referenda may be avoided.

The "proposed bill," to which the order and the Opinion relate, is Senate, No. 317 of 1934, and is as follows:

An Act further regulating the Use of Traps and Other Devices for the Capture of Fur-bearing Animals and providing for Local Option Thereon.

WHEREAS, The deferred operation of this act would in part defeat its purpose to terminate without further delay the uncertainty that has attended its subject matter, therefore it is hereby declared to be an emergency law, necessary for the immediate preservation of the public convenience.

Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same, as follows:

SECTION 1. Chapter one hundred and thirty-one of the General Laws is hereby amended by inserting after section one hundred and five A, as appearing in the Tercentenary edition, the following two new sections: —

*Section 105B.* Subject to the provisions of sections one hundred and five C and one hundred and fourteen A, whoever uses, sets or maintains any trap or other device for the capture of fur-bearing animals which is likely to cause continued suffering to an animal caught therein, and which is not designed to kill such animal at once or to take it alive unhurt, shall be fined fifty dollars; but this section shall not apply to traps or other devices for protection of property if set or maintained not more than fifty yards from any building, cultivated plot of land, or enclosure used for the rearing of poultry, including game birds, to the use of which building, plot or enclosure the presence of vermin may be detrimental.

*Section 105C.* If there is filed with the clerk of any city or town a petition signed by twenty-five registered voters thereof or in towns having a population of less than five hundred, by two per centum of the registered voters thereof, requesting such action, said clerk shall

cause to be submitted to the voters of such city or town at the next municipal election the following question, to be voted on by ballot, said question to be placed on the official ballot in cities, and in towns using official ballots at town elections, for the election of city and town officers: — "Shall the operation of section one hundred and five B of chapter one hundred and thirty-one of the General Laws, requiring for the taking of fur-bearing animals the use of traps that kill at once or take such animals alive unharmed, be suspended within this city (or town)?"

| YES. | |
|------|--|
| NO. | |

or, if the operation of section one hundred and five B has been so suspended, the question: — "Shall section one hundred and five B of chapter one hundred and thirty-one of the General Laws, requiring for the taking of fur-bearing animals the use of traps that kill at once or take such animals alive unharmed, be again operative in this city (or town)?"

| YES. | |
|------|--|
| NO. | |

as the case may be.

If a majority of the votes cast in such city or town in answer to the question submitted is in the affirmative, said section one hundred and five B shall not, or shall, as the case may be, thereafter apply to such city or town unless and until a majority of the voters thereof voting on the other question at a municipal election vote thereon in the affirmative.

SECTION 2.   Section one hundred and five A of said chapter one hundred and thirty-one, as amended by chapter two hundred and three of the acts of nineteen hundred and thirty-three, is hereby repealed.

SECTION 3.  Said chapter one hundred and thirty-one is hereby further amended by inserting after section one hundred and fourteen, as appearing in the Tercentenary edition, the following new section: —

*Section 114A.*   The commissioner may by order, whenever in his opinion such action is necessary, suspend for not exceeding thirty days the operation, within any specified territory under the control of the department and designated in such order, of the provisions

of section one hundred and five B. The provisions of section one hundred and eighteen, so far as apt, shall apply to such an order.

SECTION 4. The selectmen of a town, upon petition filed with the town clerk and signed by twenty-five registered voters thereof, or in towns having a population of less than five hundred, by two per centum of the registered voters thereof, requesting that the question first set forth in section one hundred and five C of chapter one hundred and thirty-one of the General Laws, as appearing in section one of this act, be submitted to the voters of the town at a special town meeting in the current year, shall call such a meeting to be held not later than thirty days following the filing of such petition. Said question shall be submitted to the said voters at such meeting voting by ballot thereon, with the same force and effect as if submitted under said section. Towns divided into voting precincts shall, if the selectmen so order, vote on said question at such election in their several precincts.

The order was transmitted to the Justices on May 23, 1934, and on June 4, 1934, they returned the following answers:

To The Honorable the Senate of the Commonwealth of Massachusetts:

The Justices of the Supreme Judicial Court respectfully submit these answers to the questions in an order adopted on the twenty-second of May, 1934, copy whereof is hereto annexed.

The questions relate to the so called steel trap law adopted by the initiative at the election in 1930. St. 1930, c. 428, embodied in G. L. (Ter. Ed.) c. 131, § 105A. That law in substance prohibited under penalty the use of any trap or other device for the capture of fur-bearing animals likely to cause continued suffering to an animal caught therein, except that it did not apply "to traps or other devices for protection against vermin if set or maintained not more than fifty yards from any building or cultivated plot of

land to the use of which vermin may be detrimental." By St. 1933, c. 203, approved May 16, 1933, there was enacted a substitute for § 105A whereby its provisions were made inapplicable "to traps or other devices for protection of property if set or maintained on land by the owner or tenant thereof, or, if authorized by such owner or tenant, by any member of his family or person employed by him." Thus the sweep of said § 105A was materially restricted. A referendum petition was filed on June 6, 1933, and completed on August 14, 1933, respecting said c. 203, and its operation was suspended. In ordinary course that law will be submitted to the people for approval at the State election to be held November 6, 1934. See Acts & Resolves 1933, page 728.

Several changes in the existing law are made by the proposed bill. By its § 2, St. 1933, c. 203, suspended by the referendum, is itself repealed so that, if the proposed bill becomes law, there will no longer be any § 105A. By its § 1, in the part described as § 105B, the provisions of G. L. (Ter. Ed.) c. 131, § 105A, as originally enacted, are in substance restored and reënacted; and, in the part described as § 105C, provision is made whereby the several cities and towns are authorized within their respective boundaries, from time to time, by popular vote, to suspend the operation of § 105B and again to make it operative.

The first question is whether the prohibition under penalty of the use of steel traps found in that part of the proposed bill set forth in its § 105B may properly be made subject to the kind of local option prescribed in that part of § 1 set forth in its § 105C.

A fundamental principle of our system of government is that power to make laws for the general welfare is vested in the General Court, except as affected by art. 48 of the Amendments to the Constitution. That power cannot be surrendered or delegated. In harmony with that principle, it has long been established that certain police regulations and other matters peculiarly affecting local interests, not embraced within the ordinary power to make by-laws and ordinances, may be intrusted by express legislation to

municipal authority.   There are numerous illustrations of statutes of this nature.   The legality of sales of intoxicating liquor, *Commonwealth* v. *Bennett*, 108 Mass. 27, rules as to the use of vehicles, *Brodbine* v. *Revere*, 182 Mass. 598, *Commonwealth* v. *Slocum*, 230 Mass. 180, 190, limitations of the height of buildings, *Welch* v. *Swasey*, 193 Mass. 364, and divers other matters, have been held subject to local regulation under the sanction of legislative enactment.

The purpose of the steel trap law as originally adopted was to suppress that kind of cruelty engendered by capturing the designated animals in traps of such construction as to cause them pain and suffering for an appreciable length of time. It created an offence against the public morals, which the commission of acts of cruelty to animals tends to corrupt. It was within the competency of the law making power under the Constitution to declare that purpose superior to the rights of owners of poultry and vegetables to protect such property against the depredations of predatory fur-bearing animals. *Commonwealth* v. *Higgins*, 277 Mass. 191.   The need of drastic measures against the vermin mentioned in the proposed bill may differ in different places.   The burden of damage done by such vermin depends upon their number and upon the pursuits of the inhabitants in a particular locality.   These vary widely in the several cities and towns of the Commonwealth.   That burden rests mainly upon those who cultivate the land or raise poultry.   It is within the power of the General Court, in balancing the conflicting claims of those who bear this uncompensated loss, on the one side, and the danger to the public morals likely to follow from acts inflicting pain upon such vermin, on the other side, to determine that the operation of the statute should be placed under local control.   *Commonwealth* v. *Plaisted*, 148 Mass. 375, 382–383.   *Commonwealth* v. *Kingsbury*, 199 Mass. 542, 546.   *Commonwealth* v. *Maletsky*, 203 Mass. 241, 245. *Bradley* v. *Board of Zoning Adjustment*, 255 Mass. 160, 171. *Commonwealth* v. *Boston & Maine Transportation Co.* 282 Mass. 345.

This principle is controlling although the form of submission to local option in the proposed bill relates to the sus-

pension in the municipality so voting of a law otherwise general in its operation. That was the substance and effect of the law relating to sales of intoxicating liquors as contained in R. L. c. 100. The general purpose of that law was the prohibition of such sales. That general prohibition was suspended in such cities and towns as voted each year in favor of granting licenses. Thus in the several municipalities there might be the prohibition of such sales in one year and the licensing of such sales in another year, depending upon the popular vote in each city and town. *Commonwealth* v. *Nickerson*, 236 Mass. 281, 304–305. A provision of that nature in the circumstances here disclosed does not violate art. 20 of the Bill of Rights of the Constitution against the suspension of laws except by special provision of the Legislature. Such a provision is not contrary to the ample constitutional guaranties for equal protection of equal laws without discrimination based upon unreasonable distinctions. *Brest* v. *Commissioner of Insurance*, 270 Mass. 7, 14.

The first question is answered in the affirmative.

The second question is: "Do the words 'unless in the meantime it shall have been repealed', contained in the third sentence of section three of said article forty-eight, under the heading, 'III. Referendum Petitions.', apply to all statutes as to which a referendum petition has been filed, or is its application limited to statutes enacted less than thirty days prior to the next ensuing State election?"

The entire sentence from which are taken the words quoted in the question is very long. Its several parts are set off one from another by semicolons. That sentence, omitting parts not material to the question, is in these words: "If such petition is completed by filing with the secretary of the commonwealth not later than ninety days after the law which is the subject of the petition has become law the signatures of not less than fifteen thousand qualified voters of the commonwealth, then the operation of such law shall be suspended, and the secretary of the commonwealth shall submit such law to the people at the next state election, if thirty days intervene between the date when such petition is filed with the secretary of the commonwealth and the date for

holding such state election; if thirty days do not so intervene, then such law shall be submitted to the people at the next following state election, unless in the meantime it shall have been repealed; . . ." Thus it appears that all referendum petitions there described are divided into two classes: first, those where the completed petition is filed so that thirty days or more intervene before the next State election; and second, those where the completed petition is filed so that thirty days do not so intervene. The words "unless in the meantime it shall have been repealed" are joined to the provision governing the second class of referendum petitions, namely, such as are filed with the Secretary of the Commonwealth so that thirty days do not intervene before the date of the next State election; they are separated by a semicolon from the provision governing the first class of referendum petitions, namely, such as are filed so that thirty days or more do intervene before the date of the next State election. It often has been held that punctuation may be disregarded in construing statutes. Resort may be had to punctuation, however, to aid in dissolving an obscurity, especially in so important an instrument as an Amendment to the Constitution, which must be presumed to have been framed with great care, particularly when presented by a constitutional convention. A proviso or exception of this nature, according to ordinary rules of construction, is confined to the last antecedent. As matter of interpretation of the language of the Amendment and the arrangement of its words, it seems necessary to say that the words "unless in the meantime it shall have been repealed" are limited to petitions completed by filing so that thirty days do not intervene before the next State election. *Commonwealth* v. *Kelley*, 177 Mass. 221, 223. This interpretation of § 3 finds confirmation in § 4 of "III. Referendum Petitions" of art. 48 of the Amendments to the Constitution. That section is entitled "Petitions for Referendum on an Emergency Law or a Law the Suspension of which is not asked for," while § 3 is entitled "Mode of Petitioning for the Suspension of a Law and a Referendum thereon." So far as permissible in view of the different subjects to which they relate, these two sec-

tions are in almost identical language, except as to the number of completing signatures required on the petition. The portion of § 4 in which occur the words "unless in the meantime it shall have been repealed" is set off in a sentence by itself. That sentence relates solely to such petitions for referendum as are completed by filing so that thirty days do not intervene before the date for holding the next State election. The quoted words of proviso or exception in that section are thus clearly restricted to petitions filed so that less than thirty days intervene before the next State election. It is unlikely that a different procedure was intended in this particular under the two sections. There is every reason to believe that it was designed that the referendum upon those two classes of statutes should be governed by the same provisions.

The plain implication from the entire sentence of § 3 of "III. Referendum Petitions," in which occur the words quoted in question two, is that the General Court may repeal the second class of laws, as to which the proviso or exception quoted in that question implies, pending a referendum, so that the referendum may become ineffective because the law made subject to the referendum petition has ceased to exist, and that it may not repeal with like effect the first class of laws, as to which the proviso or exception does not apply, because the words of said § 3 make it imperative that in general such laws be submitted to the vote of the people at the next State election; and it must be presumed that such submission, without proviso or limitation, was intended to be effective and operative upon an existing law. If there were no such proviso or exception in said § 3 as to either class of laws, an interesting question might arise whether the full legislative power, which, under "I. Definition," of art. 48 of the Amendments, "shall continue to be vested in the general court," might not authorize the repeal of any law pending a referendum.

It is difficult to discover why there should be express reservation of power in the Legislature to repeal a law when the petition for a referendum respecting it is filed so that less than thirty days intervene before the next State elec-

tion, and an omission of reservation of such power when the petition for a referendum respecting a law is filed so that thirty days or more intervene before the next State election. Possibly that phraseology arose from the fact that, in 1917, when art. 48 of the Amendments was by the Constitutional Convention framed, approved and voted to be submitted to the people, there were annual elections. Art. 15 of Amendments to the Constitution. It may have been thought so improbable as to be negligible that there would be time and disposition to repeal a law by the Legislature which enacted it, when its members were elected annually. Biennial elections are required by art. 64 of the Amendments to the Constitution. (See St. 1919, c. 269, now G. L. [Ter. Ed.] c. 54, § 62.) That Amendment was by the Constitutional Convention approved and voted to be submitted to the people several months later than was art. 48, although both were adopted by the people at the same State election in November, 1918. It may well be that, if biennial elections had been foreseen, the proviso or exception would have been made applicable to all petitions for referendum. However that may be, the words of § 3 must be interpreted as framed.

It is respectfully suggested that the alternative in the second question, stated in its concluding phrase, viz., "or is its application limited to statutes enacted less than thirty days prior to the next ensuing State election," does not refer to any situation created by § 3 of "III. Referendum Petitions" of art. 48 of the Amendments. That amendment refers to the filing of a referendum petition, not the enactment of a statute, within thirty days before the State election.

The answer to the second question is that the words "unless in the meantime it shall have been repealed" in the third sentence of § 3 of "III. Referendum Petitions" of art. 48 of the Amendments to the Constitution, do not apply to all laws as to which a referendum petition has been filed but are limited in application to laws as to which the completed referendum petition has been filed so that thirty days do not intervene prior to the next State election.

In view of the answer to question two, it seems unnecessary to answer questions three and four. Those questions relate to matters which, in accordance with that answer, are not now before the General Court for action. They therefore do not require answers. *Opinion of the Justices*, 148 Mass. 623; 217 Mass. 607.

The fifth question in substance and effect is whether, if the proposed bill be enacted with an emergency preamble, the pending referendum as to St. 1933, c. 203, would nevertheless be required under art. 48 of the Amendments to be upon the ballot at the State election for the current year. The emergency preamble of the proposed bill sets forth facts constituting the emergency to be that the deferred operation of the act would "in 'part defeat its purpose to terminate without further delay the uncertainty which has attended its subject matter" and declares that it is "necessary for the immediate preservation of the public convenience." The enactment of the proposed bill with an emergency preamble would cause it to take effect as a binding and efficacious law, forthwith and without suspension. Art. 48, "The Referendum," "II. Emergency Measures." That subdivision of the Amendment is separate and complete in itself. It authorizes the enactment of any proper emergency law. It contains no exceptions. It does not expressly or by implication exempt from its scope laws as to which petitions for a referendum have been instituted under "III. Referendum Petitions" of art. 48. These two provisions, however, must be construed to be in harmony, so far as possible. An emergency law is itself made subject to a referendum petition by § 4 of "III. Referendum Petitions" of art. 48. Unless and until an emergency law "shall not be approved by a majority of the qualified voters voting thereon," as provided in said § 4, it is in full force and effect and binding upon the public notwithstanding the filing of a completed referendum petition concerning it. The proposed bill by its § 2 repeals G. L. (Ter. Ed.) c. 131, § 105A, as amended by St. 1933, c. 203. The latter act has been suspended by the completed referendum petition. The proposed bill is not merely or primarily a repealing law. It is

a comprehensive enactment, as stated in the order transmitting the questions, as part of "a plan or compromise" to cover in a new way the entire subject of steel traps as applied to the capture of fur-bearing animals. Examination of the proposed bill confirms the accuracy of that description. The repeal of said c. 203 is a necessary incident of that plan. If the proposed bill is enacted with an emergency preamble and is thereafter made subject to a completed referendum petition, all its provisions including the repeal of St. 1933, c. 203, will nevertheless be in effect forthwith and so continue until "it shall not be approved by a majority of the qualified voters voting thereon" at the next State election as provided in § 4 of "III. Referendum Petitions." By such want of approval, "it shall at the expiration of thirty days after such election be thereby repealed." A referendum upon a law no longer in existence is a contradiction in terms. The "popular referendum" according to art. 48, "I. Definition" is "the power of a specified number of voters to submit laws, enacted by the general court, to the people for their ratification or rejection." When under that part of art. 48 contained in "The Referendum," "II. Emergency Measures," a law previously enacted but suspended by a referendum petition has been repealed as part of a comprehensive law at once effective, there is nothing upon which a referendum as to the earlier law can operate. As matter of reason this seems the necessary result of the several provisions of art. 48 as to "The Referendum." *McBride* v. *Kerby*, 32 Ariz. 515. *In re Senate Resolution*, 54 Colo. 262. *State* v. *Whisman*, 36 S. D. 260. See, however, *State* v. *Becker*, 240 S. W. 229, a Missouri decision not officially reported. This conclusion is confirmed by other considerations. The provisions of §§ 3 and 4 of "III. Referendum Petitions," as already analyzed, disclose a plain purpose that a law which has been repealed in accordance with the process there indicated shall not be submitted to the people. The process of repeal indicated in those sections, as has been pointed out in the answer to the second question, is narrowed to one class of laws. Nothing in those sections confines or limits the effect of laws

enacted as emergency laws pursuant to "The Referendum," "II. Emergency Measures." If an emergency measure dealing in a comprehensive way with a subject is enacted, which involves as an incident the repeal of a law already suspended under a referendum petition, that repeal becomes immediately effective. There would be great incongruity in holding that a referendum upon a suspended law thus repealed must continue, when there is no provision to that effect in §§ 3 and 4 of "III. Referendum Petitions." Those sections, so far as they touch upon the subject, denote that there is to be no referendum respecting a law which has been repealed. If the proposed bill is enacted as an emergency law and no referendum is had upon it, then the pending referendum upon the suspended St. 1933, c. 203, would be vain. If by vote of the qualified voters it were rejected, such rejection would add nothing to the repeal contained in the emergency law; and, if approved, such approval would be ineffective, because that law has already been repealed by the emergency law, which has been and will continue to be in full force and effect. If there should be a referendum on both laws and both should be approved, a troublesome conflict would arise. Which would be in effect, c. 203 or the emergency law? It is to be observed that in art. 48 provision is made, under "The Initiative," "VI. Conflicting and Alternative Measures," for the solution of somewhat similar problems. No such provision is made under "The Referendum." The framework of art. 48 thus bears strong indication that "The Referendum" was intended to be so construed and interpreted as to avoid such perplexing problems, if reasonably practicable.

An emergency law enacted pursuant to "II. Emergency Measures" of "The Referendum" of art. 48 differs essentially from an ordinary law subject to the referendum. Such an ordinary law does not take effect earlier than ninety days after it has become law and it is further suspended until after approval by vote of the people, provided a referendum petition respecting it is filed in accordance with § 3 of "III. Referendum Petitions" of art. 48. The several paragraphs of "The Referendum" mean that St. 1933,

c. 203, suspended under the pending referendum petition, has never become an effective statute. It is an inchoate and uncompleted statute, still in its incipient stage. *Rosenthal* v. *Liss*, 269 Mass. 373. It stands on a different footing from an operative statute binding upon the public. The General Court under the legislative power which continues to be vested in it by "I. Definition," of art. 48, may repeal such an inchoate and incomplete statute as part of a comprehensive emergency measure covering the whole subject. A completed referendum does not so fasten itself upon such a law as St. 1933, c. 203, as to remove it from legislative power and compel its submission to popular vote in all circumstances, notwithstanding an intervening change of legislative purpose manifested by a duly enacted emergency measure. The very presence in art. 48 of the reservation to the General Court of power to enact emergency measures imports competency to enact laws with respect to matters of high importance which override the inchoate and incomplete law of an ordinary nature suspended by a referendum petition. It is of such nature, even though an inchoate and suspended law, that it may be repealed by the General Court by the enactment of an emergency measure. Such a suspended inchoate and incomplete law comes to an end and ceases to exist by a repeal embodied in an emergency law. It does not thereafter revive even though the emergency law may be repealed by popular vote on referendum. The provisions of G. L. (Ter. Ed.) c. 4, § 6, First, are not applicable because such an inchoate and uncompleted law does not come within its descriptive phrase "previous statute" which may be revived.

The fifth question is answered in the negative.

The sixth question in substance is whether, if the proposed bill were enacted without an emergency preamble, the pending referendum as to St. 1933, c. 203, would be required under art. 48 of the Amendments to be upon the ballot at the State election for the current year.

This question is answered in the affirmative. The reasons are stated in the answer to the second question.

The fifth and sixth questions have been answered be-

cause they appear to relate essentially to the power of the legislative department of government and the consequences of its proposed action with respect to the form of enactment of the proposed bill. Whether the Justices may be required to answer questions concerning the duty of the Secretary of the Commonwealth, is not involved.

It is unnecessary to answer the seventh question because the fifth question has been answered in the negative.

By reason of illness, Mr. Justice Wait has been prevented from participating in the consideration of these questions and answers.

ARTHUR P. RUGG.
JOHN C. CROSBY.
EDWARD P. PIERCE.
FRED T. FIELD.
CHARLES H. DONAHUE.
HENRY T. LUMMUS.